BALMER, J.
**726 This land use case requires us to interpret a 2013 statute, Oregon Laws 2013, chapter 462, section 2, that allows landowners to replace certain dwellings on land that is zoned for exclusive farm use (EFU). Kay King owns EFU-zoned land in Lane County and received county approval to replace three dwellings on the property that had been demolished in 1997. The issue is whether the 2013 statute authorizes the construction of replacements for the three dwellings. After the county approved the construction permits, LandWatch Lane County (LandWatch) appealed to the Land Use Board of Appeals (LUBA), which reversed the county's approval, holding that the statute did not permit construction of the replacement buildings.
*223 LandWatch Lane County v. Lane County , 76 Or. LUBA 350 (2017). King petitioned for judicial review of the LUBA decision, and the Court of Appeals reversed. LandWatch Lane County v. Lane County , 291 Or. App. 41, 420 P.3d 37 (2018). We allowed LandWatch's petition for review, and, for the reasons set out below, we reverse the decision of the Court of Appeals and remand to LUBA for further proceedings.
I. BACKGROUND
We take the facts from the record of the proceedings below. King, hereafter referred to as "landowner," owns a farm of approximately 100 acres in rural Lane County, near the City of Florence. In 1997, landowner obtained permits to demolish three lawfully-established dwellings on the property-one built in the early 1900s, one in the 1940s, and one in the 1950s. Landowner demolished those buildings pursuant to the permits. In 2016, landowner applied for special use permits to construct three replacement dwellings, and the county granted the permits in 2017. The county concluded that the applications met the requirements of the 2013 statute for the construction of replacement dwellings on EFU-zoned land. We discuss that statute in detail below.
LandWatch appealed the county's issuance of the permits to LUBA, raising various arguments, including that the 2013 statute was not intended to allow the general "replacement" of dwellings that landowners had demolished long before the statute was enacted. LUBA agreed and held **727 that the statutory provision on which landowner had relied was intended to allow replacement of only dwellings on EFU-zoned land that had been assessed as dwellings for property tax purposes within the five years immediately preceding the permit application. Landowner filed a petition for judicial review of the LUBA decision to the Court of Appeals, which reversed, holding that "the statute exempts destroyed or demolished buildings from the [previous five-year assessment] finding otherwise required." LandWatch Lane County , 291 Or. App. at 52, 420 P.3d 37. We allowed LandWatch's subsequent petition for review.
II. ANALYSIS
A. Introduction
The challenge that LUBA and the Court of Appeals faced-and that we now confront-is the scope of a particularly opaque statute, Oregon Laws 2013, chapter 462, section 2. The parties agree that through that statute, the 2013 Legislative Assembly undertook to modify and to expand the circumstances under which a dwelling could be built on EFU-zoned land.[1] They further agree that the changes that the legislature adopted were not intended to permit the construction of dwellings where no dwelling had ever existed previously. The dispute, rather, is over the scope of the 2013 statute and, in particular, the circumstances under which an existing or former dwelling can be replaced.[2] The parties reprise the arguments that they made to LUBA and to the Court of Appeals, with LandWatch arguing that the disputed provision of the statute generally permits the replacement of only buildings that were assessed as dwellings during some part of a five year period preceding the permit application, and landowner arguing that that provision permits the replacement of buildings that had at one time been **728 assessed as dwellings, even if they were demolished more than five years before the owner applied for a permit to construct a replacement dwelling.[3] *224 The parties' dispute requires us to construe the 2013 statute, which modified earlier laws regarding the replacement of dwellings on EFU-zoned land. In doing so, we employ our usual methodology to determine the legislature's intention in enacting the statute by looking at the text of the statute in context, along with any useful legislative history. State v. Gaines, 346 Or. 160, 171-72, 206 P.3d 1042 (2009).
Section 2 of 2013 Oregon Laws, chapter 462 provides:
"(1) A lawfully established dwelling may be altered, restored or replaced *** in the manner provided by either subsection (2) or (3) of this section.
"(2) The dwelling may be altered, restored or replaced if, when an application for a permit is submitted, the permitting authority:
"(a) Finds to the satisfaction of the permitting authority that the dwelling to be altered, restored or replaced has, or formerly had:
"(A) Intact exterior walls and roof structure;
"(B) Indoor plumbing consisting of a kitchen sink, toilet and bathing facilities connected to a sanitary waste disposal system;
"(C) Interior wiring for interior lights; and
"(D) A heating system; and **729 "(b) Finds that the dwelling was assessed as a dwelling for purposes of ad valorem taxation for the lesser of :
"(A) The previous five property tax years unless the value of the dwelling was eliminated as a result of the destruction, or demolition in the case of restoration, of the dwelling; or
"(B) From the time when the dwelling was erected upon or affixed to the land and became subject to assessment as described in ORS 307.010unless the value of the dwelling was eliminated as a result of the destruction, or demolition in the case of restoration, of the dwelling.
"(3) The dwelling may be altered, restored or replaced if, when an application for a permit is submitted, the dwelling meets the requirements of subsection (2)(a) of this section, the dwelling does not meet the requirement of subsection (2)(b) of this section, and the applicant establishes to the satisfaction of the permitting authority that the dwelling was improperly removed from the tax roll by a person other than the current owner."
(Emphasis added.)[4] Now, put a finger on that statutory text-or pull it up in another browser window, as the case may be-because we will refer to it repeatedly in the remainder of the opinion.
B. Textual Analysis of Section 2
We begin with what is readily apparent from the text of the statute, before addressing its ambiguities. First, subsection (1) makes clear that a dwelling may be "replaced" only if it was "lawfully established" in the first place. LandWatch does not dispute that the dwellings that formerly existed on landowner's property were "lawfully established." Second, the replacement (or restoration or alteration) of a dwelling on EFU-zoned *225 land also must meet **730 the requirements of either subsection (2) or subsection (3) of section 2.
We focus first on subsection (2) because landowner argues only that her proposed replacement dwellings come within that provision.[5] Subsection (2) has two requirements. The first, paragraph (2)(a), identifies structural features that the dwelling to be replaced "has, or formerly had," including indoor plumbing, interior wiring for interior lights, and a heating system. Thus, a farm building, such as a stable or barn, that lacks one or more of the listed features is not considered a dwelling for purposes of the statute, even if it is inhabited from time to time, and, therefore, no permit can be issued to replace such a structure with a dwelling. Significantly, however, as the "has, or formerly had" wording indicates, those elements need not exist at the time of an application for a permit to replace such a dwelling: if the landowner can demonstrate that the dwelling had intact exterior walls or a heating system at some earlier time, it can meet the requirements of subparagraphs (2)(a)(A) and (2)(a)(D). Thus, a currently dilapidated dwelling can meet that requirement. Moreover, that wording is sufficiently broad, at least facially, to encompass not only an existing dwelling that "has, or had" those elements, but also a dwelling that at one time possessed those elements but that has been demolished or destroyed.
But possessing (or formerly possessing) the structural elements is not sufficient. The central dispute in this case is over paragraph (2)(b), which brings into play the tax assessment history of the dwelling to be replaced. That provision requires a finding that, at the time of submission of the application for a permit to replace or restore the dwelling, "the dwelling was assessed as a dwelling for purposes of ad valorem taxation for the lesser of" two different time periods. That reference to "assess[ment] as a dwelling" reinforces two aspects of the requirements for a replacement dwelling: that the structure currently or formerly served as a dwelling, and that it is or was assessed and on the tax rolls as a dwelling. The statute then describes how to calculate **731 the time periods described in subparagraphs (2)(b)(A) and (2)(b)(B), so as to determine which is "lesser."
Putting to one side for a moment the key disagreement between the parties-the meaning of the clause following the word "unless" in those subparagraphs-subparagraph (2)(b)(A) allows a replacement dwelling if the structure was assessed as a dwelling for "the previous five property tax years," thus providing a fixed numerical value for one time period (five years) to be used for comparison with the numerical value in subparagraph (2)(b)(B) to determine which time period is "lesser." In addition, because the time period in subparagraph (2)(b)(A) is five years, and the statute requires use of the "lesser" period during which the building was assessed as a dwelling, the net effect is to establish a maximum five-year "look back" during which the structure was assessed as a dwelling, unless some exception applies.
The numerical value of the comparison time period in subparagraph (2)(b)(B)-again putting to one side the clause following "unless"-depends on when the dwelling was "erected upon or affixed to the land and became subject to assessment" as real property. That number could be less than five if, for example, the dwelling was constructed and assessed three years before application for the replacement permit. Considering only the initial clauses of subparagraphs (2)(b)(A) and (B), then, a landowner would be permitted to replace a dwelling that has or formerly had the structural elements required by paragraph (2)(a) if the landowner can show that, as of the time when the permit was sought, the building was assessed as a dwelling for the lesser of (1) the previous five property tax years, and (2) the time when the dwelling was built and became subject to assessment.
Two illustrations may be helpful. Again, looking only at the first clauses of subparagraphs *226 (2)(b)(A) and (B), if, in 2018, a landowner sought a permit to replace a dwelling that had been built and subject to assessment in 1970, but that had ceased to be assessed as a dwelling in 1990, the relevant time period under (2)(b)(A) would be the "previous five property tax years," while the relevant time period under (2)(b)(B) would be 48 years, so five years would be the **732 lesser time period. Because the structure in that example was not assessed as a dwelling for the previous five years, the permit would not be granted. On the other hand, if the dwelling had been assessed as a dwelling for the previous five years, the permit would be allowed. Further, if, in 2018, a landowner sought a permit to replace a dwelling built and assessed in 2015, the "lesser" assessment period would be the three years under (2)(b)(B), rather than the "previous five property tax years" under (2)(b)(A), and the permit would be allowed. That structure and the text of paragraph (2)(b) thus indicate that at least one purpose of the statute was to permit replacement of a building that "was assessed as a dwelling for ad valorem taxation" for the "lesser" of two time periods and one of those was "previous five property tax years." That interpretation suggests that a dwelling's tax assessment more than five years before a replacement permit was sought is irrelevant.
But paragraph (2)(b) contains additional text, and the parties disagree over the meaning of that text. As noted above, although the requirement for relatively recent tax assessment is the lesser of the five years identified in (2)(b)(A) and the time "when the dwelling was erected upon or affixed to the land and became subject to assessment" in (2)(b)(B), both of those provisions contain an identical exception:
"*** unless the value of the dwelling was eliminated as a result of the destruction, or demolition in the case of restoration, of the dwelling."
LandWatch argues that the function of each "unless" clause is to permit an adjustment to the statutory time period calculations, if the building had no value during part of each identified time period due to destruction or demolition. It agrees with LUBA's holding on that issue:
"[Paragraph (2)(b) ] requires that the county find the dwelling was assessed as a dwelling for purposes of ad valorem taxation for the lesser of the time periods set out in (A) and (B). As we understand the statute, those time periods are (1) for the previous five tax years, or (2) for the previous five tax years except for those years where the dwelling had no value as a result of destruction or demolition of the **733 dwelling, or (3) where the dwelling was constructed within the last 5 years, the rest of that 5-year period. Stated differently, [subparagraphs (2)(b)(A) and (B) ] work together to specify the default, and longest, assessment look-back possible-five years. That five-year look back may be shortened under the exception clauses if either the dwelling has existed for fewer than five years or 'the value of the dwelling was eliminated as a result of the destruction, or demolition in the case of restoration' within the last five years. That five-year look back may not be lengthened to start and end at a time prior to the five-year period."
LandWatch Lane County , 76 Or. LUBA at 254 (emphases in original).[6]
Landowner and the Court of Appeals read the "unless" clauses in paragraph (2)(b) differently. In their view, the parallel clauses do much more than provide a potential shortening of the five-year period (or shorter period if the dwelling was constructed within five years), if a dwelling was demolished or destroyed during that period. Rather, they argue, the "unless" clauses create a broad exemption that takes the demolished or destroyed dwelling out of the otherwise applicable requirements of paragraph (2)(b) altogether. Thus, landowner argues, if the value of the dwelling was eliminated as a result of demolition or destruction-whether that occurred *227 three or 10 or 75 years ago-the owner is not required to show that the dwelling was subject to property tax assessment in the previous five years at all. The Court of Appeals reasoned accordingly and stated, "[I]t is logical to conclude that the legislature intended to excuse demolished dwellings from the taxation requirement altogether." LandWatch Lane County , 291 Or. App. at 49, 420 P.3d 37.
We turn to a closer examination of the competing arguments. The parties agree that, prior to the enactment of the 2013 statute, a dwelling on EFU land could be replaced only if it met certain structural requirements for a habitable dwelling at the time of the permit application. The statute thus precluded the replacement of seriously **734 dilapidated dwellings that no longer met the structural requirements and also of dwellings that had been demolished or destroyed. See ORS 215.213(1)(q) (2011) (permitting replacement of dwelling on EFU land only if dwelling "has" specified structural elements).[7] And the parties agree that House Bill (HB) 2746 (2013), the bill that became the statute at issue here, was intended to address what some owners of EFU-zoned land felt were unreasonable limitations on their ability to construct replacement dwellings, including, in particular, dilapidated buildings. But the question is how far the legislature intended to go in loosening the requirements to replacing dwellings on EFU-zoned land.
Returning to the text of the disputed provisions of Oregon Laws 2013, chapter 462, section 2, as noted, LandWatch argues that the Court of Appeals erred in interpreting the "unless" clauses in subparagraphs (2)(b)(A) and (B) to exempt demolished or destroyed dwellings from paragraph (2)(b) and its ad valorem tax assessment requirement altogether. LandWatch's argument has substantial textual support.
The textual focus of paragraph (2)(b) is the requirement of a finding "that the dwelling [to be replaced] was assessed as a dwelling for purposes of ad valorem taxation" for a specific time period. The text of that paragraph also plainly provides that a replacement dwelling permit cannot be issued unless the "permitting authority *** finds that the dwelling was assessed as a dwelling for purposes of ad valorem taxation" under the "lesser" of subparagraph (2)(b)(A) and subparagraph (2)(b)(B). Paragraph (2)(b) thus appears to require that one of the two time periods must apply, and not to contemplate that there might be an exception from the assessment period altogether. Assessment as a dwelling, for whichever is the "lesser" time period, is the controlling requirement of paragraph (2)(b).
The location and words of the "unless" clauses provide support for that view. The clauses are not set out as a **735 single, separate subparagraph of paragraph (2)(b), as one would expect if the legislature intended to carve out a general exemption from the assessment requirement for all destroyed or demolished dwellings. Instead, each "unless" clause is placed in the text directly following each of the two "time period" descriptions in subparagraphs (2)(a)(A) and (B). Those clauses therefore appear to be intended to apply to the determination of those time periods, rather than to create a complete exemption from the overarching assessment requirement set out at the beginning of paragraph (2)(b). The words used also reflect that understanding. Subparagraph (2)(a)(A) describes a period of the "previous five property tax years" and then sets out the "unless" clause. Subparagraph (2)(b)(B) also is phrased to lead to the calculation of a time period: "From the time when the dwelling was erected ***," followed by its own "unless" clause. (Emphases added.) Thus, both of the "unless" clauses that follow those time period descriptions appear to allow the time periods to be adjusted if the conditions in each "unless" exception are met-that the dwelling had no value during part of the otherwise applicable time period because it was demolished or destroyed-but not to ex empt *228 such a dwelling from the ad valorem tax assessment requirement itself.
The Court of Appeals reached the contrary conclusion in part because it thought that LUBA's and LandWatch's position would require that the word "unless" in subparagraphs (2)(a)(A) and (B) be replaced by "until" or "until such time as," and that such a deviation from the statutory text was impermissible. LandWatch Lane County , 291 Or. App. at 48-49, 420 P.3d 37. It is true that the legislature could have used a more felicitous word than "unless" to indicate the circumstances in which the specified time period could be shortened. But given the context of the "unless" clauses and their placement directly after the description of the two comparison time periods, LandWatch appears to have the better textual argument in asserting that the clauses "simply mean that the applicant need not have paid ad valorem taxes for the entire previous five years in the event of demolition or destruction within that five-year period, and, if so, the applicant would have to have paid taxes within the five-year **736 period for the years during which the dwelling had taxable value."
But landowner's textual argument is not implausible. As the Court of Appeals noted, "unless" can mean "except on the condition that" (among similar constructions), and the inclusion of that clause in subparagraphs (2)(b)(A) and (2)(b)(B) could establish a potentially expansive exception that would allow replacement of any dwelling, if the value of the dwelling had been "eliminated as a result of the destruction, or demolition in the case of restoration, of the dwelling." Landowner asserts, and the Court of Appeals ultimately agreed, that the plain meaning of the statutory text excuses demolished former dwellings from the "lesser of" requirement altogether. LandWatch Lane County , 291 Or. App. at 48, 420 P.3d 37.
That would be a far-reaching conclusion. Under that reading, the "unless" clauses would completely exempt any demolished or destroyed dwelling-whether demolished three or 10 or 75 years ago-from the tax assessment requirement of paragraph (2)(b).[8] Under landowner's interpretation, any dwelling that ever existed on EFU land, but no longer does, can be replaced, as long as the building at some point had the structural elements listed in paragraph (2)(a). That would appear to permit a potentially substantial number of replacement dwellings across the state, which would be a surprising result, based on the concerns that led to the 2013 amendment, as discussed below. As noted, however, although words in the "unless" clauses, standing alone, could encompass landowner's interpretation, we think that the structure of paragraph (2)(b) and the placement of the words the legislature used point more plausibly in the other direction, and that LandWatch and LUBA therefore have the better textual argument. We turn to the other arguments raised by the parties to see whether they support or undercut that tentative conclusion.
**737 C. Context
The parties also assert that various aspects of the context of paragraph (2)(b) of Oregon Laws 2013, chapter 462, section 2, support their respective positions. In particular, the parties discuss subsection (3), which as noted above, provides an alternative to subsection (2) for a landowner to construct a replacement dwelling, although it is not the provision upon which landowner relies here. Subsection (3) allows the replacement of a dwelling that meets the structural element requirements of paragraph (2)(a), does not meet the required time period for the property to be taxed as a dwelling under paragraph (2)(b), but was "improperly removed from the tax roll by a person other than the current owner." Key to the operation of subsection 2(3) is the statutory (and somewhat counterintuitive) definition of "improperly removed." That definition is as follows:
*229 "As used in this section, 'improperly removed' means, with respect to a dwelling removed from the tax roll, that:
(a) The dwelling has taxable value in its present state, or had taxable value when the dwelling:
(A) Was first removed from the tax roll; or
(B) Was destroyed by fire or other act of God; and
(b) The county stopped assessing the dwelling even though the current owner did not request removal of the dwelling from the tax roll."
Or. Laws 2013, ch. 462, § 2(8) (emphases added).
Subsection (3), using the statutory definition of "improperly removed," allows a current owner to avoid the requirements in paragraph (2)(b) regarding a dwelling's recent tax assessment history and also to construct a replacement dwelling even if the dwelling to be replaced is no longer on the tax rolls-including because it has been demolished-but only in certain circumstances: The landowner must establish that (1) "the county stopped assessing the dwelling even though the current owner did not request removal of the dwelling from the tax roll," Or. Laws 2013, ch. 462, § 2(8)(b), and (2) the dwelling, although removed from the tax rolls, "has taxable value in its present state,"
**738 or had taxable value when it was "first removed from the tax roll" or "was destroyed by fire or other act of God," id. at § 2(8)(a).[9]
LandWatch argues that subsection (3) of section 2 was intended by the legislature to describe the circumstances in which demolished dwellings generally could be replaced. LandWatch then points out that the effect of the Court of Appeals decision-by essentially eliminating the tax assessment requirement of subsection (2)(b) for demolished dwellings-is to render subsection (3) meaningless, or at least superfluous, because virtually all destroyed or demolished dwellings could be replaced under subsection (2). Because we generally interpret statutes to give effect to all their provisions, see ORS 174.010,[10] LandWatch argues that the context provided by subsection (3) significantly undermines the Court of Appeals' construction of the statute.
LandWatch overstates its case. Even if the Court of Appeals' construction of paragraph (2)(b) would exempt landowner and others seeking to replace destroyed or demolished dwellings from the tax assessment requirement set out in that paragraph, that would not render subsection (3) superfluous. At the very least, subsection (3) would apply when a previous owner had improperly removed an existing dwelling from the tax roll more than five years before a replacement permit was sought and the dwelling has taxable value in its present state. In those circumstances, the current owner would not be able to meet the tax assessment requirement of paragraph (2)(b), but would meet the alternative requirement in subsection (3). That said, as to destroyed or demolished dwellings, the Court of Appeals' broad interpretation of the "unless" clauses of subparagraphs (2)(b)(A)
**739 and (B) appears to subsume most, if not all, of the situations in which subsection (3) would apply. That very substantial overlap invites some doubt as to whether the legislature intended such an interpretation.
Landowner also points to subsection (3) as context for interpreting paragraph (2)(b), but draws different conclusions. First, landowner observes, that, because subsection (3) permits the replacement of dwellings that were "improperly removed" from the tax rolls by a previous owner-including by demolition-LandWatch's claim that the Court of Appeals' decision opens up EFU land for the replacement of any dwelling that ever existed on the land is misleading. That is true, landowner *230 argues, because, under subsection (3), that opportunity already exists, for the most part, and will continue to exist regardless of the how subsection (2)(b) is interpreted.
Second, and again focusing on the contrast between subsection (2) and subsection (3), landowner argues that LandWatch's interpretation of subsection (3) results in "complex, arbitrary distinctions among landowners in slightly different circumstances." She notes that, because she has owned her land continuously since the dwellings were removed, her permit requests cannot fall within subsection (3) because the dwellings were not "improperly removed from the tax roll by a person other than the current owner ." (Emphasis added.) However, she continues, if the dwellings had burned down and landowner had then sold the property, the new owner would be eligible for a replacement permit. Similarly, if a former owner had improperly removed the dwellings from the tax roll before landowner had purchased the property, and landowner had later demolished the dwellings, she would be eligible for a permit. Landowner claims that there is "no policy justification for this discrepancy." She concludes that LandWatch's proposed interpretation is therefore absurd and cannot be what the legislature intended.
Landowner's contextual arguments are not without merit, but also are not necessarily persuasive evidence of what the legislature did intend. The argument that subsection (3), which incorporates the broad definition of **740 "improperly removed" from subsection (8), already permits the replacement of most demolished dwellings on EFU land, because it makes new owners eligible for permits, suggests that LandWatch's "floodgates" concern with replacement dwellings on EFU-zoned land may be exaggerated. But it does not directly address the interpretive challenge with regard to paragraph (2)(b). That provision clearly evinces a legislative concern that existing dwellings have been subject to tax assessment in the years immediately before the application for a replacement dwelling permit. Whether the legislature understood, or had information regarding, the potential extent of new dwelling construction that would be permitted under either subsections (2) or (3) is not clear from the legislative history. But if the legislative history, which we discuss below, makes anything clear, it is that the "unless" clauses added to subparagraphs (2)(b)(A) and (B) were intended to deal with a narrower problem.
As to the claimed "complex" and "arbitrary" distinctions among property owners who are in only slightly different circumstances, it is not difficult to postulate plausible policy reasons for many of the legislature's choices. It would not be unreasonable, for example, for the legislature to deny a replacement building permit to a landowner who had removed a dwelling from the tax rolls when the building in fact had taxable value-to deter such improper conduct-but to allow a subsequent owner to obtain a permit.
Landowner does point to one possible anomaly: that a dwelling destroyed by "fire, or other act of God" (and therefore "improperly removed" under subsection (8)) could be replaced by a subsequent owner of the land under subsection (3), while if one of landowner's dwellings had been destroyed by fire, she would not be able to replace it, either under subsection (3) (because she remains the owner), or under LandWatch's interpretation of subsection (2). But that circumstance-which, of course, is not present here-is too slender a reed to support landowner's proposed interpretation of paragraph (2)(b). Much legislation-and certainly much land use legislation-is necessarily complex, given the multiple and sometimes competing goals that policymakers **741 seek to advance and the myriad fact situations to which general legislation will apply. Moreover, many distinctions that legislative choices entail involve line-drawing that can appear "arbitrary." A statute of limitations, for example, may require that a claim be filed within two years of the date of injury. There is no policy justification for drawing the line at two years rather than two years and one week, and the line is "arbitrary" in that sense, but it is a permissible legislative choice. Similarly, if the legislature imposes more restrictive criteria for a current landowner who demolished a dwelling on his or her own property (or even whose dwelling was destroyed by fire) to be *231 eligible to build a replacement dwelling than for a landowner whose predecessor demolished a dwelling (or whose dwelling was destroyed by fire), landowner points us to nothing in Oregon law that would make that an improper policy choice.
We understand that landowner does not argue that we must interpret paragraph (2)(b) to provide her the same right to construct a replacement dwelling that a subsequent owner of her land would have under subsection (3). Rather, she claims that the arbitrary eligibility distinctions in LandWatch's proposed interpretation would lead to absurd results, which should weigh against that interpretation if the statutory text is capable of multiple constructions. But the absurd results canon is best applied sparingly-only when the statute is truly ambiguous and the result is truly absurd. If we were to do otherwise, "we would be rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result." State v. Vasquez-Rubio , 323 Or. 275, 283, 917 P.2d 494 (1996) ; see also id . at 283 n. 4, 917 P.2d 494 (expressing doubt that a particular result was as absurd as a party alleged). As we note below, after consulting the legislative history, paragraph (2)(b) is not sufficiently obscure to bring the absurd results canon into play, and the results contemplated by LandWatch's reading are not so extreme as to make us doubt that the legislature would have tolerated them.
D. Legislative History
Much of the legislative history to which the parties refer is sufficiently general that it can support both **742 interpretations of paragraph (2)(b). There is no doubt, as the Court of Appeals noted, that "[t]he sponsors and supporters of HB 2746 stated that the purpose of the bill was to expand the availability of replacement-dwelling permits." LandWatch Lane County , 291 Or. App. at 50, 420 P.3d 37. But that overall purpose is consistent with both parties' positions and gives no hint as to the scope of the expansion that the legislature intended or the controlling interpretive issue in this case, which is the meaning of the "unless" clauses in subparagraphs (2)(b) (A) and (B). Nevertheless, the path that led to the 2013 passage of HB 2746, as well as the testimony of its sponsors and supporters, makes clear that the legislature did not intend paragraph (2)(b) to authorize replacement of dwellings that had been destroyed or demolished many years earlier.
As noted, before the passage of HB 2746, a replacement permit for a dwelling located on EFU land could be granted only if the dwelling to be replaced "has" the structural elements listed in the statute, including a sink, toilet, interior wiring, and so on. See ORS 215.213(1)(q) (2011). As introduced, HB 2746 would have allowed replacement permits if the dwelling "has or had" those elements, or the applicant "establishes that the dwelling is, for purposes of ad valorem taxation, assessed as a dwelling." Bill File, HB 2746, Feb. 6, 2013 (introduced bill) (emphasis added). That initial version would have allowed replacement of any existing or demolished dwelling that met or formerly met the structural requirements, and any existing dwelling that was currently assessed as a dwelling.
During hearings in February 2013 and in statements and documents submitted to the House Committee on Land Use at that time, the bill's sponsors and supporters explained that its purpose was to address the problem of dwellings that were ineligible for replacement because they did not presently meet the structural requirements. Both actual and hypothetical examples of such dwellings were discussed, including former dwellings where "a wood stove has been removed or the roof has caved in," Audio Recording, House Committee on Land Use, Feb. 21, 2013, at 10:16 (statement of Katie Fast) https://olis.leg.state.or.us (accessed Apr. 17, 2019);
**743 a building that was "deteriorating" and "completely uninhabitable," from which vandals had taken "all the wiring, the plumbing," id . at 14:11 (statement of Dave Vanasche); and an "abandoned house * * * that is beyond repair (uninhabitable)," Exhibit 6, House Committee on Land Use, HB 2746, Feb. 21, 2013 (statement of Mark Unger).
In the House, the provisions of paragraph (2)(b) were tightened by requiring findings that the dwelling "has, or formerly had" the listed structural elements and "is assessed as a dwelling for purposes of ad valorem taxation *232 and has been for the previous five property tax years." Bill File, HB 2746, Apr. 26, 2013 (A-Engrossed). That version also introduced the "improperly removed" provision, subsection (3), and the statutory definition of that term, which remained in the bill when it eventually was enacted into law, as subsection (8), although the definition of "improperly removed" was further modified during the legislative process.
The "unless" clauses at issue in this case were drafted in response to the five-year assessment period set out in HB 2746 (A-Engrossed). David Hunnicutt of Oregonians in Action and other proponents of the bill were concerned that the blanket "five year" tax assessment period in the A-Engrossed bill would not permit the replacement of buildings that had not been on the tax roll as dwellings for five years because they had been both constructed and destroyed within the past five years:
"[T]he problem is in *** section 2(2)(b), *** one of the changes that have been made to the replacement dwelling statutes with this bill is that *** in order to replace it, the dwelling has to have been assessed for property tax purposes for at least the last five years. The problem becomes, what happens if the dwelling was built four years ago and it burns down, or three years ago or two years ago or whatever, it burns down, it's destroyed by floods, something of that nature. The way the bill's currently written, if that were the fact pattern, the property owner, who just basically has a new or relatively new dwelling, would not be able to replace it. Currently they would be able to replace it, but if this bill passed with this language they wouldn't be able to replace that. So we needed to add language *** to deal **744 with the situation where a dwelling was less than five years old and *** to make sure that property owners of those types of dwellings, if the dwelling needed to be replaced, that they could benefit and use the provisions of this statute as they could under current law."
Audio Recording, Senate Rural Communities and Economic Development Committee, May 16, 2013, at 28:17 (statement of David Hunnicutt), https://olis.leg.state.or.us (accessed Apr. 17, 2019) (emphasis added).
At a subsequent hearing, the Senate committee considered responsive amendments, which introduced the "unless" clauses discussed above, along with some other changes not pertinent here. At that hearing, Hunnicutt again described HB 2746 as necessary to "address the issue that was raised and brought forward *** about the dilapidated dwellings and their ability to replace them." Audio Recording, Senate Rural Communities and Economic Development Committee, May 30, 2013, at 14:33 (statement of David Hunnicutt), https://olis.leg.state.or.us (accessed Apr. 17, 2019).He again described the problems that the amendments solved, in somewhat greater detail, and described the effect of the amendments to subparagraph (2)(b)(B):
"We amended House Bill 2746 to address a problem created by the language of section 2(2)(b), which currently requires a property owner to demonstrate that their dwelling is assessed as a dwelling and has been assessed for the last five tax years. There are two problems with this language. First, a dwelling that is less than five years old would not qualify to be replaced under this subsection even if it had been taxed as a dwelling since it had first been occupied. Second, a dwelling that was destroyed or otherwise demolished by the owner for replacement or rebuilding during the five-year period wouldn't qualify to be replaced under this subsection, even if it would have been taxed as a dwelling during this five-year period, except for the fact that the *** value of the dwelling was eliminated because it was destroyed or demolished by the owner for replacement or rebuilding.
"So we made amendments to section 2(2)(b) to resolve this problem. For a dwelling that is more than five years **745 old, the amendments allow the dwelling to satisfy this subsection if the dwelling is taxed as a dwelling for the past five years, or if the dwelling would have been taxed as a dwelling for the past five years but stopped being taxed as a dwelling because *233 it was destroyed or demolished by the owner for replacement or rebuilding.
"For a dwelling that is less than five years old, the amendments allow the dwelling to satisfy this subsection if the dwelling has been taxed as a dwelling since it was first occupied or if the dwelling would have been taxed as a dwelling since it was first occupied but stopped being taxed as a dwelling because it was destroyed or demolished by the owner for replacement or rebuilding.
"If a former dwelling has not been taxed as a dwelling during the last five years, it does not meet the criteria in section 2(2)(b) and must meet the standards in section 2(3) ."
Id . at 15:11 (emphases added).
That explanation of the limited purpose of the amendments and of how they would apply to dwellings demolished more than five years ago clearly favors LandWatch's interpretation of subparagraph (2)(b)(B). We have recognized that legislative history consisting of statements by nonlegislators "sometimes provides limited assistance in determining the legislature's intent." Kohring v. Ballard , 355 Or. 297, 311, 325 P.3d 717 (2014) (emphasis in original). In this case, however, it is appropriate to rely on Hunnicutt's statements as evidence of the legislature's intent in enacting the "unless" clauses. Hunnicutt's explanation of the purpose and effect of the amendments was the only such explanation that the Senate committee received before it adopted the amendments-which it did without objection immediately following Hunnicutt's statement. See id. at 311-12, 325 P.3d 717 ("In some cases, however, it is appropriate to give greater weight to such legislative history, as when the nonlegislators were the drafters and principal proponents of a bill, and it is clear that the legislature relied on their explanations"). Because Hunnicutt played an important role in the legislative process, both in identifying the problems that the amendments addressed and in developing the text of the amendments, it seems likely that the legislature relied upon his explanation.
**746 Moreover, Hunnicutt's explanation of why paragraph (2)(b) needed to be amended and how the amended paragraph (2)(b) would function was in line with the statements of other legislators and witnesses concerning the overall purpose of HB 2746 of making it easier to replace dilapidated or run-down dwellings on farmland. As Representative Unger, who sponsored the bill, and whose family owned land that included a dilapidated dwelling, stated at the May 16, 2013, Senate hearing:
"Some farmers who will testify later today to their specific situations who have had trouble taking a house that was clearly a house where people used to live and getting the permits they need to replace the dwelling. So, this bill brought before you here is to address this group of people who have a house that has all the characteristics of a house but don't quite meet all the current guidelines for getting a new permit, tweaking them a little bit so that we can replace those dwellings where appropriate while respecting the land use laws that I think are important to respect out in these agricultural areas."
Audio Recording, Senate Committee on Rural Communities and Economic Development, HB 2746, May 16, 2013, at 23:52 (statement of Rep. Benjamin Unger), https://olis.leg.state.or.us (accessed Apr. 17, 2019). The bill was repeatedly described as dealing with a small number of farmers, "tweaking" existing requirements, and a small fix. As Hunnicutt stated, "[t]he goal of this is to clean up the replacement dwelling statutes and allow farmers in a few circumstances to replace dwellings that are already on the property, but for lack of a better term, dilapidated." Audio Recording, Senate Committee on Rural Community and Economic Development, HB 2746, May 16, 2013, at 27:00, https://olis.leg.state.or.us (accessed Apr. 17, 2019) (emphases added).
Additionally, none of the legislatively cited examples-either actual examples of dilapidated dwellings owned by farmers who testified or hypothetical examples raised in the hearings-of the kind of dwellings that would come within paragraph (2)(b) were dwellings that had been demolished or destroyed 20 years earlier. And no witness contradicted **747 Hunnicutt's statement that a dwelling removed *234 more than five years earlier would not come within the "unless" clauses.
III. CONCLUSION
To summarize, the text of paragraph (2)(b) of Oregon Laws 2013, chapter 462, section 2, is ambiguous. Under subsection (2), the legislature created a five-year "look back" period, modified for new dwellings, to implement that requirement. The legislature included the "unless" clauses to allow adjustment of the tax assessment period if the dwelling's value had been eliminated due to the destruction or demolition of the dwelling. Although landowner's argument that the "unless" clauses were intended to exempt all destroyed or demolished dwellings from the tax assessment period may not be inconsistent with the wording of those clauses, it is a strained reading of paragraph (2)(b) as a whole. That provision imposes a tax assessment requirement and sets out two time periods, the lesser of which must be applied, and one of which, because it is a fixed period-five years-is the maximum period. That structure indicates the primacy of the tax assessment requirement and, together with the placement of each "unless" clause directly after each time period, suggests that the "unless" clauses are more properly seen as describing circumstances under which the five-year "look-back" can be modified, rather than circumstances under which the tax assessment requirement does not apply at all.
With respect to landowner's contextual arguments, while we acknowledge that it is not entirely clear how subsections (2) and (3) relate to one another, the anomalies that landowner criticizes in LandWatch's proposed interpretation are hardly outside the realm of other applications of general statutes to specific circumstances. In any event, the legislative history supports LandWatch's argument that the "unless" clauses in subparagraphs (2)(b)(A) and (B) were meant to address the limited problem of dwellings that had been demolished or destroyed within the past five years, and, conversely, were not meant to apply outside of those circumstances. In our view the more persuasive interpretation of the words that the legislature used-and the interpretation that better implements the legislature's intent in using **748 those words-is that the paragraph (2)(b) does not authorize replacement dwelling permits for dwellings that were destroyed or demolished more than five years before the permit application was filed. Because landowner's replacement dwelling applications were filed more than five years after the dwellings on her property were demolished, LUBA correctly ruled that she cannot obtain replacement permits under paragraph (2)(b) of Oregon Laws 2013, chapter 462, section 2.
The decision of the Court of Appeals is reversed. The final order of the Land Use Board of Appeals is affirmed, and the case is remanded to the Board.

That expansion is only temporary. Section 2 of the 2013 statute will be automatically repealed on January 2, 2024. Or. Laws 2013, ch. 462, § 11.

There are other statutes that permit dwellings to be constructed or maintained on EFU land in specific circumstances or for certain uses. See, e.g. , ORS 215.213(1)(f) ("primary or accessory dwellings customarily provided in conjunction with farm use"); ORS 215.213(1)(d) (dwelling occupied by "relative of the farm operator or the farm operator's spouse" who is needed to assist in farm management and dwelling is on same lot as dwelling of farm operator). The only statute at issue in this case, however, is Oregon Laws 2013, chapter 462, section 2.

The statutes at issue here, and related land use statutes, use multiple words to describe the removal of an existing dwelling, such as "demolition" and "destruction," and the construction of a new dwelling, such as "replacement" and "restoration." The distinctions between those statutory terms are relevant in some circumstances, but not to the issue that we decide here, and we use some of the terms interchangeably. It is undisputed that petitioner in 1997 intentionally and lawfully removed the dwellings at issue here by demolition and sought county approval of replacement permits to construct new dwellings in 2016. Before LUBA, LandWatch made an argument that does involve the definition of "restoration" in the 2013 statute, and petitioner responds to that argument in its brief in this court. However, neither LUBA or the Court of Appeals addressed that issue, and we express no opinion regarding it.

Oregon Laws 2013, chapter 462, section 2, was not codified into the Oregon Revised Statutes, and for that reason we cite the statute as it appears in the session laws. That law amended two statutes that set out permissible uses of EFU land-ORS 215.213, which applies to uses of EFU land in Lane and Washington counties, and ORS 215.283, which applies to such uses in all other counties. As amended, ORS 215.213(1)(q) and ORS 213.283(1)(p) incorporate that provision by cross-reference to allow, as a permitted use on EFU land, "[s]ubject to section 2, chapter 462, Oregon Laws 2013, alteration, restoration or replacement of a lawfully established dwelling." ORS 215.213(1)(q) ; ORS 215.283(1)(p) ; see also Or. Laws 2013, ch. 462, §§ 4, 5.

We discuss subsection (3) below, because the parties rely on it as context for interpreting subsection (2).

Although we quote from and ultimately agree with LUBA's holding regarding subsection (2) of Oregon Laws 2013, chapter 462, section 2, the LUBA decision also discusses subsection (3). The interpretation of that provision is not before us, and we express no opinion as to whether LUBA's interpretation is correct.

As noted in footnote 4, ORS 215.213 is the statute regarding permissible uses of EFU land in Lane County and Washington County. A parallel statute, ORS 215.283, applies to all other counties, although the replacement dwelling provisions are identical. Because the land at issue here is located in Lane County, we cite to ORS 215.213.

Indeed, under petitioner's reading, it appears that any landowner who wanted to replace any existing dwelling on EFU-zoned land could avoid the requirements of subsection (2)(b) altogether by simply destroying or demolishing the dwelling. That circumstance is not present here, since the dwellings at issue were demolished many years ago, and we express no conclusion as to whether or not such actions would be permissible under subsection (2)(b) or other statutes or rules.

We interpret subsection (3) only to the extent required to assess the parties' competing arguments about the context that section provides for their respective interpretations of subsection (2)(b). We do not undertake a comprehensive analysis of how subsection (3) may or may not apply to specific replacement dwelling scenarios.

ORS 174.010 provides:
"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."